Filed 5/22/23 P. v. Andrews CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JASON WESLEY ANDREWS,<br><br>Defendant and Appellant. | F085020<br><br>(Fresno Super. Ct. No. CF94519731)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County. Alvin M. Harrell III, Judge.

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

Appellant and defendant Jason Wesley Andrews (Andrews), and codefendants Susan Lee Russo (Susan) and Bobby Leon Morris (Morris), were jointly charged with count 1, first degree murder with two special circumstances, and count 2, conspiracy to commit murder, for the murder of Susan's husband, David Russo (David).

After a joint jury trial, Susan was convicted of count 1, first degree murder with two special circumstances; count 2, conspiracy to commit murder; and count 3, solicitation of another person to murder Morris; she was sentenced to life in prison without possibility of parole for murder, plus 25 years to life for conspiracy.

The jury was unable to reach verdicts for any of the charges against Andrews. Prior to retrial, he pleaded no contest to count 1, first degree murder, in exchange for the dismissed of the special circumstances and other charges and was sentenced to 25 years to life. Codefendant Morris entered into the same plea agreement and was also sentenced to 25 years to life.

In 2022, Andrews filed a petition in the superior court for resentencing pursuant to Penal Code section 1172.6[1] and alleged he was convicted of first degree murder under the felony-murder rule or the natural and probable consequences doctrine, and he could not be so convicted under the amended law. The trial court denied the petition.

On appeal, Andrews argues his petition stated a prima facie case for resentencing under section 1172.6, and the trial court improperly made factual findings when it found he was ineligible as a matter of law.

We affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated. Andrews filed his petition in 2022 under former section 1170.95, which was amended effective January 1, 2022, and then renumbered as section 1172.6 without further substantive changes on June 30, 2022. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 714; Stats. 2022, ch. 58 (Assem. Bill. 200), § 10, eff. June 30, 2022.) As such, we refer to the subject statute by its current number throughout this opinion, except where otherwise indicated.

## FACTS[2]

Prior to his death, David Russo was on active duty in the United States Navy. David was married to Susan Russo (collectively "the Russos"). In August 1993, David and Susan were told by the military that, in the event of David's death, Susan would receive a little more than $200,000 in a lump sum benefit and a monthly payment of about $2,500, less taxes, for the rest of her life.

One day late in 1993 or early 1994, a neighbor of the Russos was playing cards with them. Susan and David got into a verbal disagreement. Susan taunted David and said, "Well, I can just have you taken out at any time." Susan told David she had friends in high places, that she was connected to the Mafia, and that she could put a "hit" out on him.

---

[2] As will be discussed below, when Andrews entered his plea agreement in 2000, he stipulated that the evidence introduced at the joint jury trial with his codefendants, where Susan was convicted of murder and the jury was unable to reach verdicts on the charges against him, constituted the factual basis for his plea.

On December 13, 2022, this court granted Andrews's request to take judicial notice of the record and nonpublished opinion in *People v. Morris et al.* (June 14, 2002, No. F035227), where this court affirmed the convictions of Andrews and codefendant Morris in their direct appeal. The following factual and procedural summaries are from *Morris*, and from *People v. Russo* (2001) 25 Cal.4th 1124, where the California Supreme Court affirmed Susan's convictions.

As will also be discussed below, in reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 406, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*People v. Clements*, at p. 292; *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) We have recited the factual statement from Andrews's direct appeal, which in turn was based on the evidence introduce at the joint jury trial, to place his arguments in context and will not rely on that factual statement to resolve Andrews's appeal from the trial court's order that found his petition did not state a prima facie case for relief.

3.

The neighbor knew David had a number of guns in the house. He had seen a nine-millimeter Beretta, a couple of handguns, and a Russian rifle, an AK-47. The neighbor and David had gone target shooting a couple of times with one of these weapons.

By July 1994, David developed some emotional problems. He began seeing a counselor in Fresno. David's first session was on July 6, 1994, and the second was on July 13, at 5:00 or 6:00 p.m. That evening, David told a friend he needed to go to bed around 10:00 p.m. because he had to go to work the next morning.

**David's Disappearance**

Eugene Stokes, who worked with David at the naval base, came to the Russo residence on July 14, 1994, at 7:00 a.m. to give David a ride to work. Susan told Stokes that David had left for cigarettes and gas the night before, about 11:00 p.m., and did not return. Russo sounded concerned, but not overly so.

About 7:30 a.m. on July 14, 1994, a farmer who lived in the rural area between Laton and Riverdale saw a male, dressed in shorts and a tank top, walking nervously down the street outside the farmer's kitchen. The man had a tattoo on one of his upper arms. He was moving quickly, seemed nervous and kept turning around and looking back. The farmer later found an abandoned car near the river, about a mile from his home. The driver's side window was down, and the backseat was covered to the top of the seat with sleeping bags and blankets.

At 8:30 a.m. on July 14, 1994, a coworker of David's got worried about his absence and telephoned the Russo residence. Susan told the coworker David had gone out for cigarettes and gas the night before and did not return. Susan sounded concerned and told the coworker that David might be in San Diego with his son who was having problems. In a later conversation that same day, Susan asked if David's paycheck would be deposited in the bank account the next day, which was payday.

David's mother spoke to Susan on the telephone late in the afternoon on July 14, 1994. Susan said that they were doing great and getting better. She did not tell David's mother that David was missing.

William Cole, David's best friend and coworker, went to the Russo home on the evening of July 14, 1994. David was not there, but Susan was present with a man later identified as Andrews. Susan told Cole that David went out for cigarettes and gas the night before and did not return. Susan expressed concern about how she was going to get David's paycheck because the next day was payday. Susan suggested David might be with a friend in Las Vegas. Cole noticed David's white Dodge Intrepid was not there. Cole knew David kept guns in the house because he talked often about his AK-47 and nine-millimeter Beretta.

**Discovery of David's Body**

Later in the evening on July 14, 1994, Fresno County Deputy Sheriff Myron Toste found David's white Dodge Intrepid in a remote rural location, on a road that winds around the Kings River. In the backseat of the car, Deputy Toste found a pile of sleeping bags. David's body was found inside the sleeping bags. The body was naked except for black shorts that were pulled down around his hips, exposing the genital area. The coroner later determined David had died from a single gunshot wound to the back of the head. Several law enforcement personnel examined the scene where David's body was found.

Detective Melinda Ybarra went to the Russo residence, but Susan was not there. About 7:45 a.m. on July 15, 1994, Susan and Andrews arrived on David's motorcycle. Ybarra told Susan that a body had been found in David's car. Susan remained calm, but said she hoped it was not David's body. Susan permitted Ybarra to walk through the house. Ybarra noticed the interior was very neat and orderly.

Susan and Andrews were separately taken to the sheriff's department for interviews.

**Interview of Andrews**

Detective Robert Moore interrogated Andrews. Andrews told Detective Moore that Susan was his good friend and housekeeper. Andrews said they were out on the motorcycle looking for David since about 10:00 p.m. the previous night. Andrews stated his relationship with Susan was platonic. He did not learn of David's death until the detective told him.

**Susan's Confession**

Detective Moore interviewed Susan, who said David had been getting counseling in Fresno, she and Andrews were friends, and she and David had not had guns in their house for over three years. She confirmed that she cleaned houses to earn income. She said David went out for cigarettes and gas about 10:30 or 11:00 p.m. on July 13, 1994. Detective Moore asked Susan if there was any blood in her house. She said no and added that Moore would not find any bullets in the house. Moore had not given Susan any information about how David had died.

Detective Moore told Susan he knew David was killed in his house. Susan then told Moore she let some people into the house about 1:00 a.m. on July 14, 1994. She stated she saw David's nine-millimeter Beretta gun. She told the people that her husband was asleep. She told them to keep their voices down because the children were sleeping. She said David was shot with a Beretta nine-millimeter, but she had given the gun to someone on July 12, 1994. Susan stated the shot was muffled and occurred while she was checking on one of her children. Susan stated she and the other people then wrapped David's head in a garbage bag, his body in sleeping bags, tied ropes around the body, and put it into the Intrepid. She later cleaned the bedroom. She had tried to put David's black shorts onto his body but could only get them up to his knees.

Susan admitted she had previously discussed David's killing with someone, and said she knew about the insurance policy, she was going to buy a house and pay bills with

6.

the insurance money, and the killing was a stupid thing to do. Susan stated the car was going to be torched.

**Evidence Inside the Russo Residence**

Detective Christian Curtice later examined the interior of the Russo home and found bloodstains on the master bedroom carpet, next to the bed. Curtice found a pillowcase, with a pattern and color that matched the pillowcase found on David's head, trash bags like the one found on the body, and yellow rope like that used to tie up the body.

Detective Curtice subsequently found a shotgun, an AK-47 rifle and a .357-magnum revolver in Andrews's residence. The serial number on the rifle and revolver matched those on paperwork found at the Russo residence.

**Arrest of Defendants**

Susan and Andrews were arrested and held at the jail.

Just after midnight on July 15, 1994, Morris turned himself in to law enforcement. He cooperated with the police, told them where certain items of evidence would be found, and led officers to various places on two different days to help them retrieve evidence.

**Susan's Attempts to Kill Codefendants Andrews and Morris**

On August 2, 1994, Susan was still in jail and approached fellow inmate Cecelia Martin. Susan said she wanted Morris killed in his cell, and asked if Martin's husband, who was also in jail, could do the job. Susan explained to Martin that if Morris was dead, she would be in the clear because it was his word against hers. Susan told Martin that she and Andrews were lovers, and she could get Martin and her husband out of jail on bail. Martin gave Detective Moore a taped statement about Susan's statements.

Cynthia Greene testified she met Susan in jail in 1994. Susan told Greene she was in custody for her husband's murder. Susan asked Greene to testify that Greene was David's lover. Susan thought this would give credibility to her claim that she was an

7.

abused wife. Susan did not offer Greene money for the proposed statement. Greene later heard Susan talking with Martin about having two people named "Bobby and Jason" killed. Susan told Martin to make the killings look like suicides. Greene told Detective Moore what she heard.

**Evidentiary Stipulations**

At trial, the parties agreed to the following evidentiary stipulations. The bloodstains on the pillowcase found in the Intrepid matched the bloodstains in David's bedroom. There were no fingerprints inside the Intrepid. If Susan's daughter were called to testify, she would say she saw Susan shampoo rugs, wash walls, and act very nervously on July 14, 1994, Susan had stayed at Andrews's residence previously, and Susan had asked her daughter to lie about her whereabouts on certain occasions.

**Additional Trial Evidence**

Travis Hayes testified that at the time of David's death, he had known Andrews for four to five months and Susan for one to two months. Andrews introduced Susan to Hayes as his old lady, and Hayes saw Andrews and Susan treat each other affectionately.

On July 13, 1994, Hayes had lunch with Andrews and Susan at a McDonald's in Fresno. Andrews told Hayes he wanted David killed as he left his counselor's office that evening. Susan stated she could get Hayes whatever money he wanted. Hayes replied he would think it over. Andrews had a nine-millimeter handgun strapped to his side and a sawed-off shotgun in the backseat of the car. Andrews and Susan dropped Hayes off at his house and gave him $100 but did not say what the money was for. Andrews told Hayes to page him at 6:00 or 6:30 that night. Hayes did page Andrews, but Andrews did not respond.

Hayes later told Andrews he could not go through with the crime, but that he had spent the $100 on drugs and would repay Andrews later. Andrews told Hayes he would catch David later that night when he returned home. Two days later, Morris picked up Hayes and took him to Andrews's home. Andrews and Susan were with a group of

8.

people. Andrews told Hayes the killing had already been accomplished and that he wanted Hayes to burn David's car. Hayes drove a pickup truck to the location of David's car but kept going because he had no intention of burning the car. Hayes passed a county car as he drove past David's car.

Steven Glick testified he came home from work on the evening of July 13, 1994, to find a number of people at his house, including Andrews and Morris, who were his acquaintances. Morris and his wife, Doris, had been staying at Glick's home until they found a home. At some point in the evening, both Andrews and Morris left, although Glick was not sure if they left together. The next morning, about 4:00 a.m., Morris returned to Glick's house and asked that Glick quickly repair the taillight on his car. While Glick worked, Morris sat in his car and listened nervously to police calls over a radio scanner. As soon as his car was repaired, Morris left and followed a white car that came by the house.

Michael Crawford testified he was at his residence on the evening of July 14, 1994, with various individuals, including Morris and Morris's wife. Crawford heard Morris ask Doris if she knew where the bullets were; she replied that she did. Morris told Doris to get rid of the bullets. Crawford then saw bullets in Doris's purse as she rummaged through it. A short time later, sheriff's deputies came to Crawford's front door. Morris left quickly through the backyard.

James Plantz testified he knew Morris and Andrews and was involved in drug dealing with them prior to David's death. About four days before David's death, Morris asked Plantz if he or anyone he knew would kill someone for $100. Morris stated he would assist the other person, but the other person would have to do the actual killing. Plantz said he could not help Morris.

On July 13, 1994, Morris and Plantz were in a car and going to Fresno. Morris told Plantz he was going to Fresno because he had to "watch [Andrews's] back" while Andrews killed some guy coming out of a meeting. Plantz had no intention of helping

9.

Morris with the crime but was going to stay in the car. While enroute, they saw a white car headed the other way. Morris stated the car belonged to "Dave" and "there he goes." Morris made a telephone call, and then drove back to Riverdale where he met with Andrews at Glick's home. Andrews asked Plantz to bring Andrews's gun from the pickup truck. Plantz did as he was asked. Andrews said he had hired someone to do a killing for $100, but that the person had backed out.

The following day, Morris went to Plantz's home and stated Andrews killed the intended victim by shooting him. Morris took out a nine-millimeter pistol, ejected a spent casing from it, and stated, "Oh, there it is."

On cross-examination, Plantz admitted having an affair with Doris Morris after Morris's arrest. Plantz admitted he sold drugs and used methamphetamine. Plantz testified he had never seen Susan use drugs or heard her ask anyone to kill another person.

**Morris's Defense**

Morris testified he used and sold methamphetamine. He met Andrews via the drug business about two and a half months before the killing. Morris described himself as the dealer and Andrews as his supplier.

About one and a half months before the killing, Andrews introduced Morris to Susan, who was a housekeeper. Soon after, Susan began buying methamphetamine from Morris. Morris said it was obvious Susan and Andrews were romantically involved.

About a week and a half before the killing, Morris heard a rumor there was a hit out on somebody in Riverdale. On July 13, 1994, Andrews told Morris he might need Morris's assistance later that night when he went to Fresno to take care of David since Hayes backed out. It was Morris's perception that Andrews was tired of the way David treated Susan. Morris thought Andrews's proposal to kill David was merely bullshit, and Morris never intended to help Andrews murder David in Fresno.

Morris headed toward Fresno with Plantz but saw David's white car pass him going the other direction. Morris paged Andrews and told him he had seen David's car leaving Fresno. Andrews told him to "cancel everything."

At 11:45 p.m. on July 13, Morris got a page from Susan, who told him Andrews wanted him to come to the Russo residence. He assumed it was to pick up drugs. Morris went to the house about 12:10 or 12:15 a.m. Andrews handed him a gun instead of drugs and stated, "I'm going to do him now." Andrews told Morris there would be $100 in it for him if he did the actual killing. Morris declined and handed the gun back to Andrews. Susan then took the gun from Andrews and said, "If you don't have the balls, I'll do it." Andrews took the gun from Susan, wrapped it in a towel as a silencer, and went to David's room with Susan. Morris heard a muffled shot. Someone asked whether the noise woke the children. Andrews came out of David's room looking very scared and "dry heaving."

Morris helped Andrews and Susan dispose of David's body and the gun. Morris felt he had no choice but to assist Andrews and Susan in disposing of the body, because his fingerprints were on the gun when he had handed it back to Andrews. Morris was shocked and stunned when he later learned he was being identified on television as the triggerman.

Morris admitted having lied to the police. He admitted he was an ex-felon and that he disposed of the murder weapon by selling it to a drug dealer named Jose in exchange for two eight balls (i.e., an eighth of an ounce each) of methamphetamine.

**Andrews's Defense**

Andrews testified he was a drug dealer, a methamphetamine user, and a business acquaintance of Morris. Andrews met Susan in January 1994. He started using methamphetamine with her in May 1994 and became sexually involved with her in June 1994.

11.

Susan discussed the idea of divorcing David "a couple of times" but never discussed the idea of killing David. A week or two before July 13, 1994, Susan gave a number of David's guns to Andrews. She gave Andrews the nine-millimeter pistol about four days before the killing. Susan told Andrews that David wanted the guns out of the house before someone ended up using them inside the house.

Andrews introduced Travis Hayes to Susan on July 13. Susan and Andrews went to Hayes's house, and then went to lunch. Someone at Hayes's house wanted to buy a gun. Andrews and Susan said they were going to McDonald's in Fresno, and Hayes asked if he could come along. Andrews claimed he bought a stereo from Hayes and gave him $100 for it.

Andrews denied that he asked Morris to come to Fresno on July 13 and watch his back. Sometime between 11:00 p.m. and midnight he got a call from Susan, who asked if he would come by and drop off some drugs. Andrews and Morris went to the Russo residence shortly after midnight and furnished Susan with drugs. Morris asked where David was. Susan told him he was in the back room.

Andrews testified Morris disappeared down the hall and Andrews heard a gunshot. Susan, who had gone to check on one of the children, asked Andrews what the sound was. Andrews replied that he did not know.

Andrews testified Morris came out of David's room with the nine-millimeter gun in his hand and pointing it at Andrews. Morris said, "Both of you come in here," and "You guys are gonna help me get rid of this," referring to David's body. Morris told Andrews and Susan to help tie up David's body and dispose of it in the car. Andrews got into the car and proceeded to drive. Morris said he would follow in another car, but he never came. The car that Andrews was driving ran out of gas. He got out and started running.

12.

Andrews felt sorry for Susan and did not think she was involved in the shooting. Susan never asked Andrews to kill David. Andrews stated neither he nor Susan killed David.

Andrews admitted he lied to the police about his relationship with Susan, his knowledge that David was dead, and his whereabouts on certain dates. Andrews did not know what David's insurance benefits were, and he had not discussed them with Susan.

Andrews admitted that when he was in jail, he got a letter purportedly from Susan which said, "Still going with Bobby being the trigger man." He also got a letter from Susan, where she said Morris killed David out of jealousy because he hoped to get Susan away from Andrews. Andrews received a number of letters from Susan stating she was pregnant.

Beth Breshears was called as a witness to impeach Morris's credibility. Morris had testified he never met David. Breshears testified she saw David and Morris in Johnny Kincaid's garage in June 1994, when David was inquiring about automotive repairs. Breshears said she believed she heard Morris speak to David but was not sure. Breshears thought Morris knew who David was.

**Susan's Defense**

Susan did not testify. Stephen Stone, an insurance agent, testified he was asked by Susan in December 1993 to take out a $50,000 life insurance policy on herself. The beneficiary of the policy was David.

## PROCEDURAL BACKGROUND

On October 7, 1994, an information was filed in the Superior Court of Fresno County charging Andrews and codefendants Susan and Morris with count 1, first degree murder of David (§ 187) with two special circumstances alleged as to all three defendants: that they intentionally killed David while lying in wait (§ 190.2, subd. (a)(15)), and they intentionally committed the murder for financial gain (*id.*,

13.

subd. (a)(1)); with further allegations that each defendant was armed with a firearm (§ 12022, subd. (a)(1)).

In count 2, the three defendants were charged with conspiracy to murder David (§§ 182, 187) with 10 overt acts alleged in furtherance thereof.

In count 3, Susan was separately charged with solicitation of Cecilia Martin to commit and join in the commission of Morris's murder (§ 653f, subd. (b)).

On October 20, 1994, Morris, Andrews, and Susan pleaded not guilty and denied the allegations.

**Jury Trial and Instructions**

On December 12, 1995, Judge Nunez convened the joint jury trial for the three defendants. "[Susan] …, Morris, and Andrews were all charged as coconspirators and principals in the killing of David. At trial, Andrews testified in his own defense, denied being the killer, and shifted the blame to Morris. Morris testified he had nothing to do with the charged crimes, that Andrews shot David, and that Morris only helped Andrews cover up the murder. [Susan] did not testify, but the prosecution introduced evidence of [her] out-of-court statement that she had allowed some people into her house on the evening of the murder, and that they had killed David. The prosecution also introduced letters written by [Susan] while in custody in which she implicated Morris as the triggerman." (*People v. Morris et al.*, *supra*, F035227.)

The jury was instructed on the liability of principals:

"The persons concerned in the commission of a crime who are regarded by law as principals in the crime thus commit and equally guilty thereof include:

"1. Those who directly and actively committed the act constituting the crime, or

"2. Those who aid and abetting the commission of the crime." (CALJIC No. 3.00.)

The jury was also instructed on aiding and abetting:

14.

"A person aids and abets the commission of a crime when he or she,

"(1) with knowledge of the unlawful purpose of the perpetrator and

"(2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime.

"A person who aids and abets the commission of a crime need not be personally present at the scene of a crime…." (CALJIC No. 3.01.)

The jury was instructed on murder (CALJIC No. 8.10), and that malice maybe express or implied, but the instruction only defined express malice (CALJIC No. 8.11); and premeditation and deliberation (CALJIC No. 8.20).

The jury was also instructed on the two special circumstances (CALJIC Nos. 8.25, 8.80, 8.81.1); second degree murder (CALJIC No. 8.30); conspiracy to commit murder (CALJIC Nos. 6.10, 6.11, 6.12, 6.13, 6.14, 6.18, 6.20, 6.21, 6.22, 6.23); that second degree murder and accessory after the fact were lesser included offenses of murder (CALJIC Nos. 6.40, 17.10); and the elements of count 3, solicitation to commit murder, and that it was only charged as to Susan (CALJIC No. 6.35).

The jury was not instructed on the felony-murder rule or the natural and probable consequences doctrine. An instruction on the natural and probable consequences doctrine was marked as requested but withdrawn, and it was not given to the jury.

**Verdicts and Mistrial**

On January 16, 1996, jury deliberations began. On January 30, 1996, the jury returned the verdicts.

Susan was convicted of count 1, first degree murder, and the two special circumstances and firearm enhancement were found true; count 2, conspiracy to commit murder, and count 3, solicitation of Morris's murder. She was subsequently sentenced to life in prison without the possibility of parole for count 1, plus 25 years to life for

15.

count 2, and six years for count 3. (*People v. Russo, supra*, 25 Cal.4th at pp. 1130–1131.)[3]

As to Andrews, the jury was unable to reach verdicts on any of the charges and allegations against him.

Morris was found guilty of count 1, first degree murder; and the jury was unable to reach verdicts on the other charges and allegations against him. (*People v. Russo, supra*, 25 Cal.4th at p. 1131.)

The court declared mistrials as to all deadlocked counts for Andrews and Morris, and the matter was set for retrial.

**Statement from Susan's Daughter**

After the mistrial in 1996, the retrial for Morris and Andrews was continued several times, and it was finally scheduled to begin on January 18, 2000.

On January 15, 2000, just before the retrial was scheduled to begin, law enforcement officers conducted a tape-recorded interview with J.G., Susan's daughter and David's stepdaughter. J.G. was 12 years old at the time of the murder and 19 years old at the time of the interview. During the interview, she identified Andrews and Morris from photographs, and told the officers what she saw in the residence at the time of the homicide.

J.G. stated that "on the night in question, she was awakened by the sound of someone shutting her bedroom door. She went to her bedroom door, turned on her bedroom light and waited by her closed door. She then heard a loud noise at which time she opened her bedroom door and peered into the master bedroom, which was located across the hallway from her own bedroom. When she looked into the master bedroom, she saw her mother, Bobby Morris, and [Andrews] standing there facing the master bedroom bed. [Andrews] was holding a handgun in his hands. [Andrews] was the

---

[3] In 2001, Susan's convictions were affirmed by the California Supreme Court. (*People v. Russo, supra*, 25 Cal.4th at pp. 1128, 1137.)

16.

closest to the bed (within an arm's reach) and was standing on the side of the bed where the victim, David …, normally slept. (The side closest to the sliding glass door.) [¶] After she made note of the three people standing near and around the master bedroom, [J.G.] said she saw a figure lying on the side of the bed where the victim usually slept. There was a blanket covering the figure and a pillow lying over the head. She assumed the covered figure was her stepfather…. She did not see any blood or other signs of injury to the figure lying on the bed."

"After making these observations, [J.G.] said she remembered being led back into her bedroom by one of the two men and curling up on her bed. As she was lying in her bed, she heard her mother and the two men talking and the sound of the master bedroom sliding glass door opening. She then heard her mother and the two men talking outside as well as other noises outside her bedroom window. She recalled hearing the sound of the car doors opening/closing and the sound of the garage door opening. [J.G.] said she was not able to make out what was being said by her mother, [Andrews] and Morris. [J.G.] said she eventually went to sleep. She woke up around dawn…. When she woke up, she saw her mother cleaning the master bedroom rug."

J.G. stated she did not come forward sooner because she did not want to testify against her mother, so she kept it to herself.

**Andrews's Motion to Exclude**

On January 18, 2000, the attorneys for Andrews and Morris acknowledged they had received the recording of J.G.'s statement, and the court granted their motion to continue the retrial.

Thereafter, Andrews filed a motion to limit or exclude J.G.'s proposed testimony from the upcoming retrial because it was contrary to her prior statements and extremely prejudicial pursuant to Evidence Code section 352. The People filed opposition.

On January 28, 2000, the court heard and denied Andrews's motion to limit or exclude J.G.'s testimony at his upcoming retrial for murder. On the same day, the

17.

attorneys for Andrews and Morris advised the court that their clients would accept the prosecutor's offer and plead no contest to first degree murder, in exchange for dismissal of the other charges and allegations.

## ANDREWS'S PLEA AND SENTENCE

Also on January 28, 2000, Andrews entered his plea. Andrews and his attorney signed a felony advisement, waiver of rights, and plea form, and Andrews initialed each paragraph. As to the factual basis, Andrews initialed the paragraph in the form that stated the facts upon which he based his plea were "Peo. vs. West -- stipulate that the evidence transcribed at 1st trial of this matter, heard by Judge Nunez, constitutes a factual basis."[4]

The plea hearing was held on the same day. The court stated the plea was based on *West*, and Andrews was also stipulating "the evidence transcribed in the first trial in this matter" constituted the factual basis. Both the prosecutor and defense counsel agreed.

The trial court asked Andrews if he had gone over the felony advisement, waiver of rights, and plea form with his counsel. Andrews said he had, and he fully understood what was in the form and appreciated the significance thereof.

The trial court advised Andrews of his constitutional rights and the consequences of his plea. Andrews stated he understood and waived his rights. The court was satisfied that Andrews made a "free, knowing, intelligent, and voluntary waiver of his rights."

The court again stated: "[T]his is a *People vs. West* plea. No factual basis need be stated. But, in any case, as stipulated, *the Court has heard all the evidence in this case*, is satisfied that there is a factual basis for the plea." (Italics added.)

Andrews pleaded no contest to count 1, first degree murder, and the court dismissed the special circumstances and other charges.

---

[4] A plea pursuant to *People v. West* (1970) 3 Cal.3d 595, is "a plea of nolo contendere, not admitting a factual basis for the plea." (*In re Alvernaz* (1992) 2 Cal.4th 924, 932.)

On March 13, 2000, Andrews was sentenced to 25 years to life in prison.

**Morris's Plea and Sentence**

Morris pleaded no contest to first degree murder, and the remaining allegations and charges were dismissed in exchange for his waiver of the right to move for a new trial based on the new evidence. He was sentenced to 25 years to life.

**Direct Appeals of Andrews and Morris**

Both Andrews and Morris filed notices of appeal that were consolidated.

On June 14, 2002, this court filed the nonpublished opinion in *People v. Morris et al.*, *supra*, No. F035227 and affirmed the judgments against Andrews and Morris.

We rejected Morris's claims of evidentiary and instructional error, and prosecutorial misconduct. Andrews's appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436. Andrews filed a letter brief, and stated he was on heavy medication when he agreed to the plea and "under dual stress and presure [*sic*]." This court reviewed the record of his plea hearing and rejected his claims.

## ANDREWS'S SECTION 1172.6 PETITION

On March 28, 2022, Andrews, in pro. per., filed a petition for resentencing pursuant to section 1172.6, and asserted he was convicted of murder based on the felony-murder rule, he could not be presently convicted based on the amendments to sections 188 and 189 that were effective January 1, 2019, and requested appointment of counsel.

The court appointed counsel to represent Andrews.

**The People's Opposition**

On May 25, 2022, the People filed opposition to Andrews's petition and argued he was ineligible for resentencing because he killed the victim with malice, and his plea and conviction were not based on the felony-murder rule, the natural and probable consequences theory, or any theory of imputed malice.

The People filed several exhibits in support of the opposition: this court's opinion from the direct appeal that affirmed the convictions of Andrews and Morris; excerpts

from the transcript of Andrews's parole eligibility hearing in 2021; and the jury instructions given at the defendants' joint trial in 1996.[5]

**Andrews's Hearing Brief**

On August 5, 2022, Andrews's counsel filed a hearing brief, and argued the trial court could not consider factual summary from his direct appeal when determining whether his petition stated a prima facie case, and the court should issue an order to show cause and conduct an evidentiary hearing.

**The Court's Denial of the Petition**

On August 18, 2022, the superior court held a hearing on the petition. Andrews's counsel waived his presence. Both parties submitted on the pleadings. The court stated it had reviewed the pleadings but did not consider Andrews's testimony at the parole board hearing in ruling on his petition.

---

[5] According to the transcript of the 2021 parole hearing, Andrews stated he was in a romantic relationship with Susan. She started talking about murdering her husband in June or July 1994 and wanted someone to kill her husband. He tried to find someone to help and introduced Susan to Morris. Susan asked Morris if he could find someone to kill her husband; Morris said he would look around, but they could not find anyone else. Andrews said the plan was to drive to David's counseling session, shoot him when he left, and make it look like a robbery, but that plan did not work out. Later that night, Susan called Andrews and Morris and told them to come to the Russo residence and bring the gun. When they arrived, Susan said David was there, and she wanted them to murder him. Morris and Andrews refused, Susan belittled Andrews, and she grabbed the gun from him. Andrews said he took the gun from Susan and agreed to do it. Andrews said he walked into David's bedroom and shot him while he was sleeping; their two children were in another room. Andrews said he never admitted that he was the shooter and kept claiming Morris did it, until he testified at the 2019 parole hearing. Andrews said he felt Susan manipulated him.

While the People filed the parole hearing transcript in support of its opposition to Andrews's petition, the People acknowledged the transcript was not part of the record of conviction to decide if he made a prima facie case for resentencing.

A defendant's sworn statements at a parole board hearing are admissible at an *evidentiary* hearing after an order to show cause is issued for a section 1172.6 petition, as "new or additional evidence." (See, e.g., *People v. Myles* (2021) 69 Cal.App.5th 688, 698, 703, 706; *People v. Anderson* (2022) 78 Cal.App.5th 81, 87–88, 93; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 583, 586–590.)

The court denied Andrew's petition.

"[I]t appears that the Court record has sufficient documentation to support a finding that there is no prima facia showing in this case *in so much as the jury instructions and other information contained within the record* demonstrate that this was not a situation where the People relied on the felony murder rule or he was an accomplice, but rather, this was indeed a case where it was a murder for hire and given the totality of the circumstances, it would appear that, again, this is not a situation of felony murder, or natural and probable consequences theory, or malice is imputed to a person based solely on the person's participation in the crime, any of that, and the Court is satisfied that no prima facia showing has been made, therefore, the petition is denied." (Italics added.)

On September 27, 2022, Andrews filed a timely notice of appeal.

## DISCUSSION

In this appeal from the denial of his section 1172.6 petition, Andrews asserts his petition stated a prima facie case for relief, the record of conviction does not refute the allegations in his petition, he did not "admit to or stipulate to any particular theory of murder" when he entered his plea, and he did not stipulate to the jury instructions as part of the factual basis for his plea. Andrews argues the trial court made improper factual findings when it denied his petition, and remand is required for issuance of an order to show cause and an evidentiary hearing on the merits.

## I.     Section 1172.6

We begin with Senate Bill No. 1437's (2017–2018 Reg. Sess.) (Senate Bill 1437) amendments of sections 188 and 189, the enactment of section 1172.6 and subsequent statutory amendments.

"Effective January 1, 2019, Senate Bill … 1437 … amended the felony-murder rule by adding section 189, subdivision (e). [Citation.] It provides that a participant in the qualifying felony is liable for felony murder only if the person: (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life. [Citation.] The Legislature also amended the natural and

21.

probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*People v Harden* (2022) 81 Cal.App.5th 45, 50–51; *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended," codified in former section 1170.95. (*Strong, supra*, 13 Cal.5th at p. 708, fn. omitted.) The original version of the statute permitted "a person with an existing conviction for felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to have the murder conviction vacated and to be resentenced on any remaining counts if he or she could not have been convicted of murder as a result of the other legislative changes implemented by Senate Bill … 1437." (*People v. Flores* (2020) 44 Cal.App.5th 985, 992.)

Effective January 1, 2022, Senate Bill No. 775 made substantive amendments to former section 1170.95 that were consistent with *People v. Lewis, supra*, 11 Cal.5th 952, and also " '[c]larified that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories.' " (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.) On June 30, 2022, the statute was renumbered as section 1172.6 without further substantive changes. (*People v. Saibu, supra,* 81 Cal.App.5th 709, 714.)

Section 1172.6, subdivision (a) thus states:

"(a) A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, *attempted murder under the natural and probable consequences doctrine,* or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or

22.

manslaughter conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply:

"(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine.

"(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder.

"(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a), italics added.)[6]

The court shall appoint counsel if requested by petitioner. (§ 1172.6, subd. (b)(3).) After service of the petition, the prosecutor shall file and serve a response. The petitioner may file and serve a reply after the response is served. (*Id.*, subd. (c).)

"After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." (§ 1172.6, subd. (c).)

If an order to show cause is issued, "the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence...." (§ 1172.6, subd. (d)(1).)

---

[6] While not applicable herein, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f).)

"At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens…." (§ 1172.6, subd. (d)(3).)[7]

## II.     The Trial Court's Denial of the Petition

The trial court complied with the procedural requirements of section 1172.6 – it appointed counsel to represent Andrews, received further briefing, conducted a hearing, and stated the reasons it was denying his petition.

In determining whether a petitioner made a prima facie case for relief, the court may review the record of conviction that allows the court "to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with the statute's overall purpose: to ensure that … culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of

---

[7] "If such evidence may not be considered at an evidentiary hearing to determine a petitioner's ultimate eligibility for resentencing, we fail to see how such evidence could establish, as a matter of law, a petitioner's ineligibility for resentencing" in determining whether he made a prima facie case for relief. (*People v. Flores* (2022) 76 Cal.App.5th 974, 988.)

a single-step prima facie review process." (*Lewis, supra,* 11 Cal.5th at pp. 971–972 & fn. 6.)

As explained above, the record and opinion from a petitioner's direct appeal are part of the record of conviction. (*Lewis, supra*, 11 Cal.5th at p. 972.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding when determining if the petitioner made a prima facie showing. (*People v. Clements*, at p. 292; *Lewis*, at p. 972.)

"In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra*, 11 Cal.5th at p. 972.) "[T]he prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Id.* at p. 971.)

To demonstrate prejudice from the denial of a section 1172.6 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

**A.    *The Jury Instructions***

The People assert that when Andrews entered his plea in January 2000, he stipulated that the record from the defendants' joint jury trial in 1995 through 1996

constituted the factual basis for his plea. The People further argue the jury instructions given at that trial are part of the record of conviction pursuant to the stipulation, and the instructions show that his plea to first degree murder was not based on any theories of imputed malice.

The jury instructions are part of the record of conviction and may be reviewed to make the prima facie determination. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1255; *People v. Offley* (2020) 48 Cal.App.5th 588, 599.) "If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Strong, supra*, 13 Cal.5th at p. 708.)

As set forth in the procedural summary above, the instructions given at the joint jury for the three codefendants show that the jury was instructed on first degree murder, direct aiding and abetting, and conspiracy to commit murder. The jury was not instructed on felony murder, the natural and probable consequences theory, any other crime as the target or nontarget offense, or any theory of imputed malice.

### B. *The Parties' Stipulations at the Plea Hearing*

Andrews acknowledges that at his plea hearing, the parties stipulated that the evidence transcribed in the first trial constituted a factual basis for his plea. However, he argues the language of the stipulation "establishes no basis to infer that he admitted acting with actual malice or was the actual killer" or the truth of particular facts, or that the stipulation extended to the jury instructions, particularly since the jury was unable to reach verdicts as to any of the charges and allegations against him.

When Andrews entered his plea, he signed a felony advisement, waiver of rights, and plea form, and initialed each paragraph. As to the factual basis, Andrews initialed the paragraph that stated the facts upon which he based his plea were "Peo. vs. West -- stipulate that *the evidence transcribed at 1st trial of this matter*, heard by Judge Nunez, constitutes a factual basis." (Italics added.) The court stated the plea was based on *West*, and that Andrews was also stipulating "*the evidence transcribed* in the first trial in this

26.

matter" constituted the factual basis, and both the prosecutor and defense counsel agreed. (Italics added.)

Andrews's stipulation at the plea hearing was to the evidence transcribed at the joint jury trial as the factual basis for his plea to first degree murder. If he had been convicted of first degree murder at that trial, the jury instructions would have been part of the record of conviction and established he was ineligible for relief under section 1172.6 as a matter of law. However, his stipulation to trial evidence as the factual basis for his plea did not extend to instructions given to a jury that was unable to reach verdicts on any of the charges and allegations against him.

As Andrews notes, "[u]nder section 1192.5, a trial court taking a plea must make 'an inquiry … of the defendant to satisfy itself … that there is a factual basis for the plea.' 'The factual basis required by section 1192.5 does not require more than establishing a prima facie factual basis for the charges. [Citation.] It is not necessary for the trial court to interrogate the defendant about possible defenses to the charged crime [citation], nor does the trial court have to be convinced of [the] defendant's guilt.' [Citation.] In addition, '[a] defendant is not required to personally admit the truth of the factual basis of the plea, which may be established by defense counsel's stipulation to a particular document.' [Citation.]' Thus, absent an indication that a defendant admitted the truth of particular facts, the stipulation to a factual basis for the plea does not 'constitute[] a binding admission for all purposes.' " (*People v. Rivera* (2021) 62 Cal.App.5th 217, 235.)

For purposes of his section 1172.6 petition, Andrews's stipulation at his plea hearing did not extend to the instructions given to a jury that deadlocked on all the charges against him or constitute admissions to the truth of the evidence introduced at that trial, to determine whether his petition made a prima facie case for relief, or he was ineligible as a matter of law.

**III.    The Court's Error Was Not Prejudicial**

To the extent the court erroneously relied on the jury instructions and/or made factual findings to deny Andrews's petition, Andrews must show it is reasonably probable that, absent error, his petition would not have been summarily denied. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

While the jury instructions were not part of the record of conviction in this case because of the mistrial, "the court may deny a petition if the petitioner is ineligible for resentencing as a matter of law. [Citation.] *In the plea context*, a petitioner convicted of murder is ineligible for resentencing if the record establishes, as a matter of law, that (1) the complaint, information, or indictment did not allow the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine, or another theory of imputed malice; (2) the petitioner was not convicted under such theory; or (3) the petitioner could presently be convicted of murder or attempted murder under the law as amended by Senate Bill … 1437.…" (*People v. Flores* (2022) 76 Cal.App.5th 974, 987, italics added.)

As will be explained, the information and charging allegations establish that Andrews was ineligible for relief as a matter of law based on section 1172.6, subdivision (a).

**A.    *The Information***

Section 1176.2, subdivision (a), states that a person convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime," may file a petition to vacate the murder conviction and for resentencing if he shows all of the following: (1) A complaint, *information,* or indictment was filed against the petitioner *that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a*

*crime*; (2) the petitioner was convicted of murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder; and (3) the petitioner could not presently be convicted of murder because of changes to Section 188 or 189 made effective January 1, 2019. (§ 1172.6, subd. (a), italics added; *People v. Flores*, *supra*, 76 Cal.App.5th at p. 987.)

Andrews argues the information only alleged a generic murder charge that would have permitted the prosecution to proceed on any theory of liability, including the natural and probable consequences theory, and he was not alleged to be the actual killer.

The information charged Andrews and his two codefendants with count 1, that they "did willfully, unlawfully, and with malice aforethought murder David Russo" in violation of section 187. As noted by Andrews, the degree of murder or his level of culpability was not specified in the information. However, count 1 also alleged two special circumstances: (1) the murder was "committed by the defendants and the defendants intentionally killed the victim while lying in wait" within the meaning of section 190.2, subdivision (a)(15); and (2) the murder was intentionally committed by the defendants for financial gain within the meaning of section 190.2, subdivision (a)(1).

Section 190.2, subdivision (a) states that the penalty for a defendant "who is found guilty of *murder in the first degree* is death or imprisonment in the state prison for life without the possibility of parole *if one or more of the following special circumstances*" are found true, including lying in wait (subd. (a)(15)) and financial gain (subd. (a)(1))." (Italics added.) As a result of the statutory allegations in the information, Andrews was charged in count 1 with first degree murder.

In count 2, Andrews and his two codefendants were alleged to have violated sections 182 and 187, that they "willfully and unlawfully conspire[d] together to murder" David in violation of section 187, and that "pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the defendants committed the following over acts," and listed 10 overt acts.

### B.    *First Degree Murder and Conspiracy to Commit Murder*

Andrews was thus charged with first degree murder of David Russo and conspiracy to commit that murder.  "[S]ection 187 defines the crime of murder as the 'unlawful killing of a human being ... with malice aforethought.'  [Citation.]  Malice aforethought 'may be express or implied.'  [Citation.]  'It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.…  [¶]  This court has observed that proof of unlawful 'intent to kill' is the functional equivalent of express malice."  (*People v. Swain* (1996) 12 Cal.4th 593, 600–601.)

A conspiracy conviction "requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy."  (*People v. Morante* (1999) 20 Cal.4th 403, 416.)

"[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder."  (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237; *People v. Beck & Cruz* (2019) 8 Cal.5th 548, 641; *People v. Medrano* (2021) 68 Cal.App.5th 177, 183.)  "[A] conviction of conspiracy to commit murder requires a finding of intent to kill, and cannot be based on a theory of implied malice."  (*People v. Swain, supra,* 12 Cal.4th at p. 607.)

Section 1172.6 "does not permit a challenge to a conviction for conspiracy to murder."  (*People v. Whitson* (2022) 79 Cal.App.5th 22, 35.)  The amendments enacted by Senate Bill 1437 (2017–2018 Reg. Sess.) and Senate Bill No. 775 (2020–2021 Reg. Sess.) (Senate Bill 775) "left unchanged section 182, which sets the penalty for conspiracy to commit murder as 'that prescribed for murder in the first degree.'  [¶]  Nothing in the legislative history of either Senate Bill 1437 or Senate Bill 775 evinces a legislative intent to lessen the penalty for conspiracy to murder under any circumstance.  This is presumably because the crime as defined in the Penal Code is based on the

conspirator defendant's own subjective mens rea: conspiracy to murder requires that a defendant either act with malice or intend to kill. [Citation.] A jury's finding that a defendant is guilty of conspiracy to murder, when a murder has in fact been committed, is 'in effect [a finding] that [the defendant] was a direct aider and abettor of the killings.' [Citation.] ' "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." ' [Citations.] In light of the foregoing, we conclude that the Legislature did not intend to provide relief from convictions for conspiracy to murder through the filing of a petition under section 1172.6." (*People v. Whitson* (2022) 79 Cal.App.5th 22, 35–36.)

### C.    *Analysis*

To the extent the trial court erroneously made factual findings when it denied Andrew's petition without issuing an order to show cause, the error is not prejudicial because he was ineligible for resentencing as a matter of law. The record of conviction includes the information filed against Andrews. The information charged Andrews with both first degree murder and conspiracy to commit murder, murder was the only target offense alleged in the conspiracy charge, and conspiracy to commit murder constitutes first degree premeditated murder and requires proof of the intent to kill.

As a result of the charging allegations, the prosecution could not have proceeded under any theory of imputed malice, and Andrews could have been convicted of murder even after the amendments to sections 188 and 189. Prior to his scheduled retrial on these same charges, Andrews accepted the prosecution's offer and pleaded no contest to first degree murder, in exchange for the dismissal of the other charges and allegations.

Andrews was thus ineligible for relief as a matter of law pursuant to section 1172.6, subdivisions (a)(1) through (a)(3).

### DISPOSITION

The court's order of August 18, 2022, denying Andrews's section 1172.6 petition, is affirmed.

31.